**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF GEORGIA**
**SAVANNAH DIVISION**

| | |
|---|---|
| ZHAOQIONG (JULIE) QIN,<br><br>Plaintiff,<br><br>v.<br><br>SAVANNAH STATE UNIVERSITY BOARD OF REGENTS,<br><br>Defendant. | CIVIL ACTION NO.: 4:24-cv-272 |

**O R D E R**

Plaintiff Zhaoqiong (Julie) Qin sued Defendant Savannah State University Board of Regents for race and national origin discrimination under Title VII of the Civil Rights Act of 1964 ("Title VII") (Count I); race discrimination in violation of 42 U.S.C. § 1981 (Count II); retaliation under Title VII (Count III); retaliation in violation of 42 U.S.C. § 1981 (Count IV); and hostile work environment in violation of Title VII (Count VII). (Doc. 1, pp. 8–13.) Presently before the Court is Defendant's Motion for Summary Judgment as to all of Plaintiff's claims. (Doc. 40.) Plaintiff filed a Response, (doc. 55), and Defendant filed a Reply, (doc. 60). For the reasons below, the Court **GRANTS in part** and **DENIES in part** Defendant's Motion. (Doc. 40.)

## BACKGROUND

### I. Factual Background[1]

#### A. Plaintiff's Employment at the University

Plaintiff's race is Asian and her national origin is Chinese. (Doc. 55-3, p. 17; doc. 55-2, p. 1.) Plaintiff was hired by Defendant in August 2019, as a "tenure-track" Associate Professor of Global Logistics and International Business in the College of Business Administration at Savannah State University (the "University"). (Doc. 55-3, pp. 1–2; doc. 55-2, p. 1.) Plaintiff was originally employed within the "Global Logistics and International Business Program" at the University, which was a department within the College of Business Administration. (Doc. 55-3, p. 2.)

The University has experienced declining enrollment in recent years. (Id. at p. 3 ("Enrollment at Savannah State University declined from 5,000 students in 2015 to less than 3,000 in 2018 and has continued to decrease in subsequent years.").) This has negatively impacted the University's budget. (See id. at pp. 2–3.) The Board of Regents requires a minimum of ten students enrolled per program for continuation. (Id. at p. 4.) At some point after Plaintiff was hired, the Logistics Program, in which Plaintiff taught at least some of her classes, was combined

[1] Defendant attached a Statement of Undisputed Material Facts to its Motion for Summary Judgment. (Doc. 40-2.) With her Response in Opposition to Defendant's Motion, (doc. 55), Plaintiff attached a Response and Objections to Defendant's Statement of Undisputed Material Facts, (doc. 55-3). Also attached to Plaintiff's Response in Opposition was Plaintiff's own Statement of Additional Material Facts. (Doc. 55-2.) Although Defendant subsequently filed a Reply in Support of its Motion for Summary Judgment, (doc. 60), it did not directly respond to Plaintiff's Statement of Additional Material Facts, (doc. 55-2). The Court has reviewed the evidence cited by Plaintiff to support the allegations in her Statement of Additional Material Facts and includes those facts where they are supported by the given citation. (Id.) For purposes of this Factual Background, the Court will accordingly cite to both Plaintiff's Response and Objections to Defendant's Undisputed Material Facts, (doc. 55-3), and, as necessary, Plaintiff's unanswered Statement of Additional Material Facts, (doc. 55-2), with accompanying citation to the record material supporting those facts. Troublingly, Defendant's Brief in Support of Summary Judgment contains a number of factual allegations that are not contained within Defendant's Statement of Material Facts and not otherwise supported by citations to supportive evidence in the record. (See, e.g., doc. 40-1, p. 2.)

with the Information Systems Program in an effort to save those programs. (Id. at p. 5.) This combined program also experienced declining enrollment. (Id. at pp. 5–6.) Because of declining enrollment and budgetary shortfalls, the University had to implement "Reductions in Force" annually from the 2018–2019 academic year through 2023. (Id. at pp. 6–7.)

Defendant claims that, "[p]rior to cutting faculty, [the] University undertook various cost saving measures including non-renewal of lecturers, reducing part-time faculty, offering a retirement incentive, cutting travel and other purchases, and freezing and cutting unfilled positions." (Id. at p. 7.) Eventually, however, the University began to institute reductions in force of faculty and staff, and, as a result of the budget cuts in 2023, thirteen employees—one of whom was Plaintiff—were subject to the reduction in force. (Id. at pp. 8–9; see doc. 55-6, p. 38 (deposition testimony of the University's legal counsel about the reduction in force).) On August 2, 2023, Plaintiff, along with twelve other tenured and non-tenured University faculty, was given official notification that no new employment contract would be offered to her for the 2024–2025 academic year "due to planned budget reductions and program modifications." (Doc. 55-3, p. 9; doc. 55-2, p. 2.) Accordingly, her employment with Defendant would end in May of 2024, at the end of the Spring 2024 semester. (Doc. 55-2, p. 2.)

Plaintiff claims that—contrary to Defendant's claim that it prioritized the non-renewal of lecturers over the non-renewal of faculty—two lecturers in the College of Business Administration—neither of whom were Asian or Chinese—were not terminated in (or prior to) the

August 2023 reduction in force (while Plaintiff, who is Asian and Chinese and was a tenure-track faculty member, was).[2] (Doc. 55-2, pp. 2–3.)

### B. Plaintiff's Written Complaints and Allegations of Discrimination

On August 6, 2023, Plaintiff sent a written complaint to Defendant's Chief Legal Officer, Flora Devine, accusing Defendant of choosing her for the reduction in force over others because she was an "Asian female" and asserting that this action was "highly [sic] discrimination." (Doc. 55-2, pp. 3–4.) The Chief Legal Officer reviewed the accusations and responded in a three-page letter, denying the accusations of discrimination and explaining to Plaintiff why she was selected for non-renewal over the two other faculty in the combined department. (Doc. 55-6, p. 73.)

On August 12, 2023, Plaintiff sent a letter to the Board of Regents "requesting discretionary review of her inclusion in the [reduction in force]," claiming it resulted in discrimination against her as an Asian female. (Doc. 55-2, p. 4.) In early September 2023, Plaintiff complained to Interim Provost Richard Miller that she was included in the reduction in force because she was an Asian faculty member. (Doc. 55-2, p. 5.)

For the 2023–2024 school year, Defendant budgeted an allowance of $700 per faculty member for work-related travel. (Doc. 55-2, p. 5.) However, on September 15, 2023, the College of Business Administration's Interim Dean Dr. Cannonier, who was Plaintiff's direct supervisor, denied Plaintiff's request to use her allotted travel allowance to attend a professional conference and present research. (Id.) Because Dr. Cannonier denied Plaintiff's travel funding request, Plaintiff could not attend the conference. (Id.) One of the "Principal Accountabilities" for

[2] Plaintiff also emphasizes that Defendant hired a "Visiting Professor of Management" in the Fall of 2023 (though she does not provide that individual's race or national origin). (Doc. 55-2, p. 3.) The minutes also indicate Plaintiff was absent from this meeting. ((Doc. 55-4, p. 97.)

Plaintiff's position was to "conduct publishable research." (Id.) One of Plaintiff's essential duties as a faculty member for Defendant was presenting her research at conferences. (Id.) As part of her evidence of this denial, Plaintiff includes an email exchange she had with Dr. Cannonier about the request. (Doc. 55-4, pp. 108–10.) The emails indicate that Dr. Cannonier advised:

> As a contracted faculty member, duties relating to service are a requirement of the position. Your absence from [College of Business Administration] faculty/staff meetings and Faculty Senate meetings has been observed and noted. Requests to provide data in support of Assurance of Learning outcomes related to AACSB Accreditation have also gone unanswered.
>
> I am highlighting these concerns so they can be rectified immediately. In light of these matters, I am unwilling to approve your recent request for travel support in October. Please take this time to address the concerns raised so any future travel requests can be given consideration.

(Id. at p. 110.)

In Fall of 2023, Plaintiff also made a request for tuition assistance which was initially denied by Dr. Cannonier. (Doc. 55-3, p. 13.) However, Provost Miller allowed Plaintiff to proceed with the tuition assistance to take the course that she was interested in taking. (Id.)

On October 27, and November 2, 2023, Plaintiff emailed Dr. Cannonier (copying multiple College of Business Administration faculty) and repeatedly accused her of discrimination. (Doc. 55-2, p. 6; doc. 55-3, p. 10.) On November 1, 2023, Dr. Cannonier emailed Plaintiff back and responded to the accusations of discrimination. (Doc. 55-2, p. 6.)

On November 14, 2023, Dr. Cannonier issued a "letter of concern" to Plaintiff. (Id.) The letter's stated purpose was to "formally addresses specific areas of concern regarding your unwillingness to manage the performance issues brought to your attention in the FA23 semester and your email communications with the faculty and administration concerning this matter and others." (Doc. 55-4, p. 53.) The letter first advised Plaintiff that she had failed to sufficiently

respond to repeated requests for "Assurance of Learning" data, which the University must submit to its accrediting body and it offered her an opportunity to work with administrators to satisfy the requirements. (Id.) Next, the letter raised concerns with Plaintiff's failure—since the separation notice in August 2023—to engage on committees that she was a member of (and it reminded her that service of this sort was a requirement of her job). (Id. at p. 54.) Finally, the letter stated:

> **Email communication with [College of Business Administration] faculty and administrators pertaining to these concerns.**
>
> I have respected your privacy in discussing your performance concerns. My emails have been to you, where you have chosen to bring your matters to the entire faculty through your email to Dr. Ebanks dated October 27, where you resigned your senate seat and made unfounded claims of discrimination against me. My response to you on November 01 addressed your discrimination charges. It was later shared with the entire faculty and included your lengthy response reemphasizing and adding claims of discrimination and abuse and dismissing all my performance concerns raised thus far.
>
> The matters raised in this letter are to be taken seriously. I have cautioned you against continued engagement in these unproductive email chains as you attempt to incite the faculty and diminish the cooperative nature of this college.
>
> Corrective action to address the behaviors outlined in this letter of concern must be taken immediately to avoid further disciplinary action.
>
> This letter of concern will become part of your official personnel file.

(Id.) Dr. Cannonier testified in her deposition that Plaintiff was a member of the faculty "Senate" and on a committee to review the faculty handbook and that she had been missing meetings for both groups. (Id. at pp. 21–22.)

While Defendant claims that "[a] letter of concern is considered an alert for behavioral matters but is not a disciplinary action," Plaintiff claims to dispute this fact because "[a] Letter of Concern is considered a 'first step' in Defendant's disciplinary process; follow-up actions if the

behavior in the Letter is not corrected include a Performance Improvement Plan ('PIP'), suspension, and even termination." (See doc. 55-3, p. 12.)

### C. Assistant Professor of Management Position

In or around July 2023, the University approved a new teaching position within the College of Business Administration: "Assistant Professor of Management."[3] (Doc. 55-2, p. 3; see also doc. 55-5, pp. 58–59.) The position was posted in late October of 2023, and Plaintiff applied for the position. (Doc. 55-2, pp. 3, 8; see also doc. 55-5, pp. 29–31.) The parties dispute, however, whether Plaintiff had the minimum qualification needed for the position. Defendant claims she did not, but Plaintiff claims:

> There were two "Required Qualifications" for the position. (Prof. of MGMT Job Posting[, (doc. 55-5, pp. 29–31)]). The first was a "doctorate in Management or a closely related field." (Id.) Dr. Qin possessed a Ph.D. from the National Center for Interdisciplinary Program in Transportation Management at the New Jersey Institute of Technology, with a thesis in "Mechanisms and methods for inventory control in supply chain management." (Qin CV[, (doc. 55-5, pp. 51–56)]). Dr. Yonpae Park – the chair of the search committee for the position – admitted in the written candidate evaluation of Dr. Qin that, "Dr. Qin met the required qualification with a doctorate in a closely related field to teach preferred courses such as operations management and statistics[.]" (Park-Qin Evaluation[, (doc. 55-5, p. 71)]; Cannonier 30(b)(6) Depo. 20:16-20, 22:9-19[, (doc. 55-5, pp. 61–62)]). The second "Required Qualification" for the position was "Prior higher-education teaching experience." (Prof. of MGMT Job Posting[, (doc. 55-5, pp. 29–31)]). Dr. Qin had been teaching in higher education since at least 2005. (Qin CV[, (doc. 55-5, pp. 51–56)]).

(Doc. 55-3, pp. 14–15.)

Dr. Michael Fronmueller, who was not involved in the reduction of force that resulted in the non-renewal of Plaintiff's contract, was the hiring manager for the assistant professor of management position. (Id. at pp. 15, 18.) Plaintiff was not selected for the position. (Id. at p. 15.)

---

[3] A new position for "Lecturer of Business" was also created and posted around the same time, but Plaintiff does not provide any additional information about that position.

Defendant claims this is because Plaintiff did not have a degree in management or in an allied discipline and, therefore, hiring Plaintiff for the position "would have put the University in violation of its ASCSB [sic] and SACS accreditation terms." (Id. at pp. 15–16.) Plaintiff disputes this, however, and states that her Ph.D. in Transportation Management, with a thesis in "Mechanisms and methods for inventory control in supply chain management," satisfied the requirement, as stated by Dr. Yonpae Park in his written candidate evaluation of Plaintiff. (Id.; doc. 55-2, p. 9.) In his deposition, Dr. Fronmueller, testified that the search committee made a mistake regarding Plaintiff's qualifications that they "should have discovered . . . early on," and he further testified that Plaintiff did not qualify because she "does not have a degree in management or allied discipline." (Doc. 55-5, p. 37.) The Court, however, has not been provided any evidence regarding whether the search committee was still under the mistaken belief that Plaintiff was qualified at the time they chose not to hire her.

Plaintiff provided a copy of Dr. Park's candidate evaluation and the Court has reviewed it. While it does state that Plaintiff "met the required qualification with a doctorate in a closely related field to teach preferred courses such as operations management and statistics," it adds that "her teaching and research background appears limited to Supply Chain and Logistics rather than the general Management discipline." (Doc. 55-5, p. 71.)

Sometime after April 28, 2024, Defendant hired Dr. Carmella Lennon-Hill, whose race is Black and whose national origin is American, for the Assistant Professor of Management position. Dr. Lennon-Hill possessed a degree in Management and relevant research, undisputedly meeting the minimum qualifications for the position. (Doc. 55-3, pp. 16–17; doc. 55-2, p. 10.) Plaintiff, however, claims that Dr. Lennon-Hill's qualifications—while meeting the bare minimum—were extremely limited, especially compared to Plaintiff's. (See doc. 55-2, p. 10 (search committee

noted a "weakness" for Dr. Lennon-Hill because she "has a short teaching background because of her recent doctoral completion"); id. at pp. 10–11 (one of the "Preferred Qualifications" for the position was "Academic preparation or experience teaching operations management and statistics," and Plaintiff "taught Operations Management at four different universities and Business Statistics at two universities" while Dr. Lennon-Hill had taught "only one Introduction to Business Statistics course and no Operations Management courses").)

### D. Plaintiff's EEOC Charges and Other Alleged Evidence of Discrimination

Plaintiff filed an initial EEOC charge on February 22, 2024.[4] (Doc. 55-3, p. 18.) On September 13, 2024, Plaintiff filed a second EEOC charge. (Id. at p. 19.)

Plaintiff points out that there was only one other Chinese faculty member in the College of Business Administration, but "[i]n January 2024, [that faculty member's] teaching duties were entirely removed and adjuncts were hired to teach some of her courses." (Doc. 55-2, p. 11.) Plaintiff does not provide much detail for why this faculty member's teaching duties were "removed" but she does state that Defendant undertook a process to "dismiss" the faculty member "for cause" and that the individual was "forced to resign at the end of Spring 2024." (Id. at pp. 11–12.) At this point, "there were no more Chinese faculty at [the College of Business Administration]." (Id. at p. 12.)

[4] Plaintiff alleges that Dr. Fronmueller learned of this EEOC charge in a meeting with Interim Provost Miller and another individual. (Doc. 55-2, p. 8.) Plaintiff does not specify when Dr. Fronmueller became aware of the EEOC charge, however. Thus, there is no evidence that Dr. Fronmueller knew of the EEOC charge prior to choosing not to hire Plaintiff for the Assistant Professor of Management position. (Id. (stating only, vaguely, that Dr. Fronmueller learned of the charge "before Plaintiff's counsel got involved in this case").)

## II. Procedural History

On December 5, 2024, Plaintiff sued Defendant. (Doc. 1.) Plaintiff's Complaint asserts claims for race and national origin discrimination under Title VII (Count I); race discrimination in violation of 42 U.S.C. § 1981 (Count II); retaliation under Title VII (Count III); retaliation in violation of 42 U.S.C. § 1981 (Count IV); and hostile work environment in violation of Title VII (Count VII). (Doc. 1, pp. 8–13.)

Defendant filed the at-issue Motion for Summary Judgment arguing that the Court should grant judgment in its favor as to all of Plaintiff's counts against it. (Doc. 40.) Plaintiff filed a Response, arguing only that her Title VII claims (Counts I, III, and V) should survive summary judgment. (Doc. 55.) Defendant filed a Reply. (Doc. 60.)

## STANDARD OF REVIEW

Summary judgment "shall" be granted if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is 'material' if it 'might affect the outcome of the suit under the governing law.'" FindWhat Inv'r Grp. v. FindWhat.com, 658 F.3d 1282, 1307 (11th Cir. 2011) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). A dispute is "genuine" if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

The moving party bears the burden of establishing that there is no genuine dispute as to any material fact and that it is entitled to judgment as a matter of law. See Williamson Oil Co. v. Philip Morris USA, 346 F.3d 1287, 1298 (11th Cir. 2003). The moving party must identify the portions of the record which establish that there are no "genuine dispute[s] as to any material fact and the movant is entitled to judgment as a matter of law." Moton v. Cowart, 631 F.3d 1337, 1341 (11th Cir. 2011). When the nonmoving party would have the burden of proof at trial, the moving

party may discharge its burden by showing that the record lacks evidence to support the nonmoving party's case or that the nonmoving party would be unable to prove its case at trial. See id. (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986)). If the moving party discharges this burden, the burden shifts to the nonmovant to go beyond the pleadings and present affirmative evidence to show that a genuine issue of fact does exist. Anderson, 477 U.S. at 257.

In determining whether a summary judgment motion should be granted, a court must view the record and all reasonable inferences that can be drawn from the record in a light most favorable to the nonmoving party. Peek-A-Boo Lounge of Bradenton, Inc. v. Manatee Cnty., 630 F.3d 1346, 1353 (11th Cir. 2011) (citing Rodriguez v. Sec'y for Dep't of Corr., 508 F.3d 611, 616 (11th Cir. 2007)). However, "facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." Scott v. Harris, 550 U.S. 372, 380 (2007). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Id. (citation and emphasis omitted). Additionally, the Court is not permitted to make credibility determinations, weigh conflicting evidence to resolve disputed facts, or assess the quality of the evidence. Reese v. Herbert, 527 F.3d 1253, 1271 (11th Cir. 2008).

**DISCUSSION**

As an initial matter, Plaintiff's Response contains a footnote stating that, "[u]pon review of Defendant's arguments regarding Plaintiff's claims under 42 U.S.C. § 1981, Plaintiff hereby voluntarily dismisses those claims." (Doc. 55, p. 2 n.1.) While Plaintiff may not unilaterally "voluntarily dismiss" her claims given the fact that Defendant has filed a motion for summary judgment, see Fed. R. Civ. P. 41(a)(1)(A)(i), Plaintiff's statement can be construed as a request for an order from the Court dismissing those claims, see Fed. R. Civ. P. 41(a)(2). Defendant

acknowledged Plaintiff's "voluntary dismissal" and offered no objection in its Reply brief. (Doc. 60, p. 1.) Alternatively, the Court can find that Plaintiff has abandoned these claims (Counts II and IV). See McIntyre v. Eckerd Corp., 251 F. App'x 621, 626 (11th Cir. 2007) ("[G]rounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned." (quoting Resolution Tr. Corp. v. Dunmar Corp., 43 F.3d 587, 599 (11th Cir. 1995))). The Court accordingly **DISMISSES** Counts II and IV. (See doc. 1.) This leaves only Plaintiff's Title VII claims for race and national origin discrimination, retaliation, and hostile work environment (Counts I, III & V). (Doc. 1, pp. 8–13.)

## I. Race and National Origin Discrimination under Title VII (Count I)

In Count I, Plaintiff claims that Defendant violated Title VII by subjecting her to less favorable terms and conditions of employment than those outside of her protected class, "including but not limited to the non-renewal of her contract, denial of professional development opportunities, and reduction of committee assignments, constitute unlawful discrimination on the basis of her race (Asian) and national origin (Chinese) in violation of Title VII." (Doc. 1, p. 8.)

It is unlawful for an employer "to discharge any individual[] or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). "In order to survive summary judgment, a plaintiff alleging intentional discrimination must present sufficient facts to permit a jury to rule in her favor." Lewis v. City of Union City, 918 F.3d 1213, 1220 (11th Cir. 2019).

### A. *Prima Facie* Case

In cases such as this one, which lack direct evidence of discrimination, courts rely on the burden-shifting framework set out in McDonnell Douglas Corporation v. Green, 411 U.S. 792

(1973). Flowers v. Troup Cnty., Sch. Dist., 803 F.3d 1327, 1335 (11th Cir. 2015). Under the McDonnell Douglas framework, "the plaintiff bears the initial burden of establishing a *prima facie* case of discrimination by showing (1) that she belongs to a protected class, (2) that she was subjected to an adverse employment action, (3) that she was qualified to perform the job in question, and (4) that her employer treated 'similarly situated' employees outside her class more favorably." Lewis, 918 F.3d at 1220–21. If the plaintiff makes this showing, the burden shifts to the employer to proffer "a legitimate, non-discriminatory reason" for the adverse employment action. Id. at 1221. Historically, under the McDonnell Douglas framework, if the employer proffers such a reason, the burden would shift back to the plaintiff to demonstrate that the proffered reason is "merely a pretext for unlawful discrimination, an obligation that 'merges with the [plaintiff's] ultimate burden of persuading the [factfinder] that she has been the victim of intentional discrimination.'" Id. (quoting Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 256 (1981)). However, in a recent published case, the Eleventh Circuit Court of Appeals held that, when

> the defendant comes forth with evidence and successfully rebuts the presumption, "the McDonnell Douglas framework—with its presumptions and burdens—is no longer relevant." [St. Mary's Honor Ctr. v. ]Hicks, 509 U.S. [502, 510 (1993)]. It "simply drops out of the picture." Id. at 511. At this point, the court must proceed to ask whether "the record, viewed in a light most favorable to the plaintiff, presents a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination [or retaliation] by the decisionmaker." Smith[ v. Lockheed-Martin Corp., 644 F.3d 1321, 1328 (11th Cir. 2011)]. A showing of pretext (or lack thereof) would certainly be relevant. But a plaintiff's inability to disprove the defendant's rationale cannot be the sole grounds for summary judgment.

Ismael v. Roundtree, 161 F.4th 752, 764 (11th Cir. 2025).

Defendant offers an array of arguments as to Count I under the heading "*Prima Facie* Case." (Doc. 40-1, pp. 5–8.) First, Defendant claims that the denial of Plaintiff's tuition assistance

request and the issuance of the letter of concern did not constitute "adverse employment actions" (and thus Plaintiff cannot establish a *prima facie* case of discrimination based on either of those occurrences). (Id. at pp. 5–7.) Defendant next argues that Plaintiff cannot make a *prima facie* showing of discrimination in Defendant's failure to hire her for the Assistant Professor of Management position because she did not have the necessary credentials for the position. (Id. at p. 7.) Lastly, Defendant argues that Plaintiff cannot show she was discriminated against based on her race and national origin with regard to the reduction in force "because thirteen people were subject to the reduction of force, of all races and nationalities." (Id. at pp. 7–8.)

**(1) The Issuance of a Letter of Concern and the Denial of Tuition Assistance Were Not Adverse Actions as a Matter of Law.**

Under the recent United States Supreme Court opinion in Muldrow v. City of St. Louis, a Title VII plaintiff alleging discrimination is no longer required to show "that the harm incurred was 'significant.' Or serious, or substantial, or any similar adjective suggesting that the disadvantage to the employee must exceed a heightened bar." 601 U.S. 346, 355 (2024) (internal citation omitted). Now she must only show "some 'disadvantageous' change in an employment term or condition;" that is, she "must show some harm respecting an identifiable term or condition of employment." Id. at 354.

Notwithstanding this reduced "harm" threshold, Defendant's issuance of the letter of concern to Plaintiff, as a matter of law, cannot be deemed an "adverse action." There is no evidence that the letter caused Plaintiff to suffer a disadvantageous change or harm respecting an identifiable term or condition of her employment. Plaintiff has not pointed to any such harm or disadvantageous change to any term or condition of her employment caused by the letter of concern. Indeed, Plaintiff admits that she was not placed on any sort of "performance

improvement plan" because of the letter nor was she suspended or terminated. (Doc. 55, p. 8.) The letter provided Plaintiff with an opportunity to address the areas of concern on her own and/or with assistance of other faculty or staff.; it did not impose any punishment or penalty. See, e.g., Arnold v. United Airlines, Inc., 142 F.4th 460, 471 (7th Cir. 2025) ("Here, even under the more generous standard of Muldrow and considering the facts in the light most favorable to Ms. Arnold, she can maintain only that she was placed on a [performance improvement plan] and that the reorganization brought about some changes in her daily responsibilities. She remained a member of the same team and continued to work in the communications department of United's operation. Her compensation, benefits, vacation times, and working hours were not affected. Nor did she provide any evidence that her assignments while on the PIP were impossible for her to complete. She was given some additional assignments, and some of her assignments changed. But these changes were all within the normal scope of her employment and thus did not adversely affect the terms and conditions of her employment."); Rios v. Centerra Grp. LLC, 106 F.4th 101, 112–13 (1st Cir. 2024) ("A mere admonition by a supervisor without any formal consequences is not an adverse employment action because it does not represent any disadvantageous change in the terms or conditions of the plaintiff's employment."); Epperson v. Hertz Corp., No. 2:24-cv-383-SPC-DNF, 2025 WL 2855368, at *2–3 & n.5 (M.D. Fla. Oct. 8, 2025) (rejecting arguments of adverse action as "unavailing because Muldrow still requires the alleged harm affect an identifiable term or condition of employment" and explaining that "disciplinary warnings are not adverse employment actions when they have no tangible effect on employment" and that "enhanced oversight and scrutiny is not itself a tangible effect on" employment nor is "the mere potential of future termination"); Wilcox v. TMCFM, Inc., No. 2:22-cv-349-JLB-KCD, 2025 WL 2097299, at *4 (M.D. Fla. July 25, 2025) ("Written reprimands by themselves do not constitute an adverse

employment decision [even under Muldrow]. The written reprimands did not change a term or condition of Plaintiff's employment, nor does she allege that they had such an effect."); Grimes v. Dep't of Def., No. 1:24-cv-1164-MSN-IDD, 2025 WL 1334054, at *3 (E.D. Va. May 7, 2025) ("Plaintiff must plead that the actions left her 'worse off.' . . . Plaintiff complains of negative feedback, ignored complaints, reprimands, requests to cover shifts, denial of telework, and lack of performance evaluations. These instances do not rise to the level of adverse employment actions."); Phifer v. Koch Foods of Ala., LLC, No. 2:24-386-RAH-SMD, 2025 WL 1248617, at *3 (M.D. Ala. Apr. 30, 2025) ("Muldrow did not change the fact that a reprimand or write-up that *does not impact the terms or conditions of employment* does not constitute an adverse action within the meaning of a Title VII for a race-discrimination claim. Here, because the Plaintiff did not plead any facts to suggest that the write-up injured him in a way that impacted his compensation, terms, conditions, or privileges of employment, the write-up is not an actionable adverse employment action, even under the some-injury standard."). Accordingly, the Court **GRANTS** Defendant's Motion for Summary Judgment and denies Plaintiff's claim that the issuance of a letter of concern constituted discrimination in violation of Title VII.

As for the tuition assistance denial, the undisputed evidence is that, while Dr. Cannonier initially denied Plaintiff's request for tuition assistance, the Provost allowed Plaintiff to proceed with obtaining tuition assistance to take the course that she was interested in taking. There is no basis for finding that this constituted an adverse employment action, particularly as there is no indication that, in being initially and only temporarily denied tuition assistance, Plaintiff suffered any "harm respecting an identifiable term or condition of her employment," Muldrow, 601 U.S. at 354–55. Indeed, Plaintiff offers no argument in her Response in support of finding that the temporary denial of tuition assistance was an adverse employment action. Accordingly, the Court

**GRANTS** Defendant's Motion for Summary Judgment and denies Plaintiff's claim that the temporary denial of tuition assistance constituted discrimination in violation of Title VII.

**(2) A Genuine Issue of Fact Exists Regarding Whether Plaintiff was Qualified for the New Professor Position.**

Turning next to Defendant's argument that Plaintiff cannot make a *prima facie* showing of discrimination through Defendant's failure to hire her for the Assistant Professor of Management position because she did not have the necessary credentials for the position, summary judgment is not appropriate because a material issue of disputed fact remains regarding whether Plaintiff was qualified for the position. Also, and perhaps more importantly, there is a material issue of fact regarding whether, at the time they chose Dr. Lennon-Hill for the position, the search committee at least *believed* that Plaintiff possessed the necessary credentials for the position. Plaintiff's candidate evaluation form created during the hiring process provides evidence that the search committee believed that Plaintiff possessed the necessary credentials for the job. In an effort to obtain summary judgment on this point, Defendant points only to the testimony of Dr. Fronmueller, who said that the committee was mistaken and that Plaintiff's credentials actually did not satisfy the requirements. This vague testimony simply creates a material factual dispute about what the committee believed and when they believed it and whether the committee's belief was correct (and Plaintiff was actually qualified) or, instead, Dr. Fronmueller's belief was correct (and Plaintiff was not qualified).

**(3) Defendant Has Not Established, as a Matter of Law, that it Did Not Treat Similarly Situated Employees Outside Plaintiff's Class More Favorably During the Reduction in Force.**

Lastly, as to Defendant's one-sentence argument that Plaintiff cannot show she was discriminated against based on her race and national origin with regard to the reduction in force

"because thirteen people were subject to the reduction of force, of all races and nationalities," (doc. 40-1, pp. 7–8), summary judgment is also not appropriate on this ground because the Court has not been provided with the necessary supporting—and undisputed—evidence establishing this fact. While Plaintiff asserts that the thirteen people who were subject to the at-issue reduction in force were "of all races and nationalities," Defendant does not even include this fact in its Statement of Material Facts. (See doc. 40-2.) And, even in its Brief, Defendant cites only very generally to the deposition of "Flora Device [sic]," without providing any sort of page or line reference. (Doc. 40-1, p. 8.) The Court presumes Defendant is intending to cite the deposition transcript of Flora *Devine*, the University's Chief Legal Officer. However, the Court declines to read through the entire deposition transcript to pinpoint testimony to support this assertion, particularly given Defendant's failure to include it in the Statement of Material Facts. Additionally, even if thirteen other people of various races and nationalities were also included in the reduction of force, that would not automatically thwart Plaintiff's *prima facie* case that her inclusion in the reduction of force was due to her race and nationality. Nor would that evidence negate Plaintiff's evidence that non-Asian faculty members within the College of Business Administration and within her specific department were not chosen for the reduction in force.

### B. Defendant's "Legitimate Non-Discriminatory Reasons" for its Conduct and Plaintiff's "Convincing Mosaic" Argument

Next, Defendant argues that, even if Plaintiff has established a *prima facie* case of discrimination, Defendant can meet its responsive burden of producing "legitimate, nondiscriminatory reasons" for the adverse employment decisions. Specifically, Defendant offers up explanations for the non-renewal of Plaintiff's contract and for the failure to hire Plaintiff for the new assistant professor position. (Doc. 40-1, pp. 8–9.) As to the contract non-renewal,

Defendant argues that the reduction in force was necessary due to "significant budgetary shortfalls because of declining enrollment." (Id. at p. 8.) As for the failure to hire claim, Defendant again points only to its position that Plaintiff was not selected for the position because she did not possess the minimum qualifications.

In her Response, Plaintiff does not explicitly challenge whether Defendant has satisfied its burden on this step of the McDonnell Douglas framework. Instead, she argues that even if Defendant has met its burden, "the record, viewed in a light most favorable to [her], presents a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker." (Doc. 55, p. 12 (quoting Ismael, 161 F.4th at 764).)

A plaintiff may establish a convincing mosaic by pointing to evidence that demonstrates, among other things, (1) suspicious timing, ambiguous statements, or other information from which discriminatory intent may be inferred, (2) systematically better treatment of similarly situated employees, and (3) pretext. Jenkins v. Nell, 26 F.4th 1243, 1250 (11th Cir. 2022). Nevertheless, simply *arguing* a convincing mosaic is not the end-all-be-all, because "[a] failure in the *prima facie* case often also reflects a failure of the overall evidence." Tynes v. Fla. Dep't of Juv. Just., 88 F.4th 939, 945 (11th Cir. 2023).

In support of her convincing mosaic argument regarding the failure to hire claim, Plaintiff points to the fact that the chair of the search committee for the new professor position "admitted in writing" (on the candidate evaluation form) that Plaintiff's degree was sufficient, which contradicts Defendant's claim that Plaintiff was not selected because she did not possess the necessary degree-related credentials. (Doc. 55, p. 12–13.) As has already been discussed within this Order, the Court agrees that material issues of fact exist concerning whether, at the time they made their hiring decision, the search committee believed Plaintiff possessed the necessary

credentials and also whether Plaintiff did indeed possess the necessary credentials. See Discussion Section I.A(2), supra.

Plaintiff's second "tile" in her failure-to-hire mosaic is her claim that a jury could compare Plaintiff's CV and candidate evaluation form with the relevant forms and CV for Dr. Lennon-Hill (who is of a different race and national origin) and find that Plaintiff possessed "superior qualifications." (Doc. 55, pp. 14–15.) Plaintiff claims this "supplements the evidence from which the jury could infer discrimination." (Id. at p. 14.) While this is not as compelling as the first "tile," it is a fact that could support a jury finding of discrimination by Defendant in its decision not to hire Plaintiff for the new position.

Turning to Plaintiff's claim that the non-renewal of her contract was racially discriminatory, Plaintiff correctly argues that Defendant's Brief focused on arguing that the reduction in force as a whole was necessary and discriminatory and ignored the true issue of "whether [Plaintiff] was included in the (otherwise legal) [reduction in force] for discriminatory reasons." (Doc. 55, pp. 15–16.) Indeed, Defendant's Statement of Material Facts did not point to any evidence to explain *why* Plaintiff was included in the reduction in force. (See generally doc. 40-2.) Within its Brief, Defendant purports to provide an explanation of the decision-making process and reasoning, but it cites no evidence to support this explanation. (See doc. 40-1, p. 2.) Accordingly, it is unclear whether a jury would have a reasonable basis to accept this theory, much less that, viewing the evidence in the light most favorable to Defendant, the explanation is indisputably correct.

Meanwhile, Plaintiff has presented a sufficiently convincing "mosaic" in support of her theory that Defendant's inclusion of Plaintiff in the reduction in force due to illegitimate discriminatory reasons. (See doc. 55, pp. 17–19.) First, she argues that there could not have been

any major "budget savings" from Plaintiff's non-renewal of her contract because there is evidence that Defendant "simply hired other people," both before and after her contract non-renewal. (Id. at p. 17.) Next, she points to evidence relating to the elimination of the one other Chinese faculty from the College of Business Administration around the same time that Plaintiff's contract was not renewed. (Id. at pp. 18–19.) Finally, she emphasizes that she was a tenure-track faculty member, yet she was selected for the reduction in force over non-Asian lecturers, despite Defendant's claim that it prioritized reductions to lecturers over professors (and particularly tenure-track professors). (Id. at p. 19.) Given Defendant's failure to provide or point to any evidence to explain how and why it selected Plaintiff for the reduction in force over others—particularly when considered along with the evidence supporting Plaintiff's other "tiles"—summary judgment cannot be entered in Defendant's favor on this claim.

In light of the foregoing, the Court **DENIES** Defendant's Motion for Summary Judgment on Plaintiff's claims, in Count I, that Defendant committed race and national origin discrimination through the non-renewal of Plaintiff's contract and through the failure to hire Plaintiff for the new professor position.[5]

## II. Retaliation under Title VII (Count III)

Title VII prohibits employers from discriminating against an employee because she "opposed . . . an unlawful employment practice . . . or because [she] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing." 42 U.S.C. § 2000e-3(a). When an employee offers purely circumstantial evidence to support her retaliation

[5] Defendant did not seek summary judgment on Plaintiff's claim that Defendant discriminated against her when Dr. Cannonier denied her request for use of her travel allowance. (See doc. 1, p. 8; doc. 55, p. 10.) Accordingly, that theory under Count I remains viable.

claim, as Plaintiff does here, the employee can defeat summary judgment by satisfying the three-step McDonnell Douglas burden shifting framework. Tolar v. Bradley Arant Boult Commings, LLP, 997 F.3d 1280, 1289 (11th Cir. 2021) (citing McDonnell Douglas, 411 U.S. at 792). The Eleventh Circuit has also applied the "convincing mosaic standard" "in equal measure to claims of discrimination and retaliation." Ismael, 161 F.4th at 760 (citing Berry v. Crestwood Healthcare, 84 F.4th 1300, 1310 (11th Cir. 2023) ("An employee may rely on a convincing mosaic of circumstantial evidence to prove retaliation.")).

At the first step of McDonnell Douglas, the employee "must establish a *prima facie* case of retaliation." Tolar, 997 F.3d at 1289 (citing Johnson v. Miami-Dade Cnty., 948 F.3d 1318, 1325 (11th Cir. 2020)). Second, if the employee successfully makes a *prima facie* case, "[t]he burden then shifts to the employer to articulate a legitimate, nonretaliatory reason for [its] adverse action." Id. (citing Johnson, 948 F.3d at 1325). Third, if the employer articulates a legitimate reason, "'the burden shifts back to the plaintiff to establish that the reason offered by the employer was not the real basis for the decision, but a pretext' for retaliation." Id. (quoting Johnson, 948 F.3d at 1325).

To establish a *prima facie* case of Title VII retaliation and satisfy the first step of McDonnell Douglas, a plaintiff must show that (1) he engaged in statutorily protected activity; (2) he suffered an adverse employment action; and (3) there is some causal relationship between the events. Id. (citing Johnson, 948 F.3d at 1325); Crawford v. Carroll, 529 F.3d 961, 970 (11th Cir. 2008). In the Complaint, Plaintiff alleges that she was retaliated against for filing an EEOC charge on February 22, 2024. Filing a complaint with the EEOC is undoubtedly statutorily protected conduct. Thompson v. N. Am. Stainless, LP, 562 U.S. 170, 173 (2011).

The Court thus turns to the adverse employment actions that Plaintiff claims to have suffered as a result. Plaintiff's Complaint alleges that, in retaliation for her filing the February

2024 EEOC charge, she suffered "denial of travel requests, denial of tuition assistance, issuance of an unwarranted 'Letter of Concern,' and reduction of professional responsibilities." (Doc. 1, p. 10.)

In its Motion for Summary Judgment, Defendant also notes that Plaintiff filed a second EEOC charge, on September 13, 2024. (Doc. 40-1, p. 11.) Defendant argues that the non-renewal of Plaintiff's contract through the reduction in force "could not have been retaliatory given the time of the Plaintiff's filing of the EEOC charges and the fact that the reduction in force had already taken place." (Id. at pp. 11–12.) Defendant adds that, "[l]ikewise, the failure to hire the Plaintiff could not have been retaliatory because Michael Fronmueller, the hiring manager for the position for which Plaintiff applied, was not involved in the [reduction in force decision] and was not aware of any complaints of discrimination made by Plaintiff." (Id. at p. 12.)

In her Response, Plaintiff purports that her Retaliation claim is based on "other adverse actions [she] experienced and the other protected complaints of discrimination she made (in addition to the EEOC charges)." (Doc. 55, p. 20.) As for the additional "protected complaints," she points to written complaints she submitted to Chief Legal Counsel Flora Devine and to the Board of Regents on two separate dates in August 2023; a complaint she made to the Provost in September 2023; and emails she sent to Dr. Cannonier in October 2023. (Id. at pp. 20–21.) As for the adverse actions, she points to Dr. Cannonier's refusal to allow her to use the travel allowance and Dr. Cannonier's issuance, on November 14, 2023, of the letter of concern. (Id.)

These additional "protected complaints" were not alleged—even vaguely—in Plaintiff's Retaliation claim in Count III of the Complaint. (See doc. 1, pp. 10–11.) Plaintiff cannot amend her Complaint through her summary judgment briefing in order to add these additional retaliation claims. Because Plaintiff did not allege these theories of relief in her Complaint, the Court will

not consider them at this time. See Cooley v. Great S. Wood Preserving, 138 Fed. App'x 149, 153 (11th Cir. 2005) (noting that Rule 8's liberal pleading standard does not permit plaintiffs to raise new claims at summary judgment stage); Gilmour v. Gates, McDonald & Co., 382 F.3d 1312, 1315 (11th Cir. 2004) ("At the summary judgment stage, the proper procedure for plaintiffs to assert a new claim is to amend the complaint in accordance with Fed. R. Civ. P. 15(a). A plaintiff may not amend her complaint through argument in a brief opposing summary judgment."). Defendants are entitled to pleaded notice of a plaintiff's claims, and defendants are not required to "infer all possible claims that could arise out of facts set forth in the complaint." Id. Furthermore, "[the district] court is barred from amending" a plaintiff's complaint for her because "the court may create the impression that it has become [her] advocate—or [her] worst enemy—depending on what the court does with the claim after amending it." Miccosukee Tribe of Indians of Fla. v. United States, 716 F.3d 535, 559 (11th Cir.2013).

Other than the failure to hire, all the alleged adverse actions undisputedly occurred prior to the filing of the first EEOC charge in February 2024. Plaintiff admits that the denial of the travel allowance occurred on September 15, 2023, and the letter of concern was issued on November 14, 2023. (Doc. 55, p. 21; see also doc. 55-3, pp. 9–10; doc. 55-4, pp. 53–55.) As for the "reduction of professional responsibilities" alleged in the Complaint, Plaintiff's own evidence indicates that she resigned from the faculty "Senate" prior to filing the EEOC charge. (See doc. 55-7, pp. 4–5.) Plaintiff does not point to any other ways that her professional responsibilities were reduced.

As for the failure to hire claim, the evidence in the record does not provide a sufficient basis for a jury to find that the hiring manager (or the search committee members, for that matter) knew about Plaintiff's EEOC charge when the decision was made not to hire Plaintiff. "[T]he causation element [of a retaliation claim] requires a plaintiff to show that the decisionmaker was

aware of the protected conduct." Wrightson v. Sec'y of Treasury, No. 25-13676, 2026 WL 2254495, at *2 (11th Cir. Aug. 5, 2026) (citing Joyner v. City of Atlanta, 170 F.4th 1320, 1334 (11th Cir. 2026)). Here, Dr. Fronmueller was asked in his deposition about when he became aware that Plaintiff had filed an EEOC charge and the best estimation that he could give was that it was sometime before Plaintiff's counsel in this lawsuit "got involved." (Doc. 55-5, p. 39.) He denied having any involvement in the University's response to the charge. (Id.) Accordingly, there is no indication that he was or may have been aware of the charge prior to the hiring decision. See Cid v. City of Miramar, 810 Fed. App'x 816, 822 (11th Cir. 2020) (refusing to "speculate" as "[t]here is no evidence that [the decisionmaker] knew that [plaintiff had] complained to human resources about national origin discrimination"). Additionally, and for the same reasons, Plaintiff has not presented a convincing mosaic of circumstantial evidence that would allow a jury to infer retaliation.

In light of the foregoing, the Court **GRANTS** Defendant's Motion for Summary Judgment as to Plaintiff's claim for Retaliation (Count III) and dismisses that claim.

## III. Hostile Work Environment under Title VII (Count V)

In Count V of the Complaint, Plaintiff alleges that "Defendant subjected Plaintiff to unwelcome harassment based on her race (Asian) and national origin (Chinese)" that was "sufficiently severe and pervasive to alter the conditions of Plaintiff's employment and create an abusive working environment." (Doc. 1, p. 12.) Specifically, Plaintiff claims the hostile work environment "included, but was not limited to: a) Issuance of an unwarranted 'Letter of Concern'; b) Threatening emails from the Interim Dean; c) Reduction of professional responsibilities without justification; d) Denial of position to which Plaintiff applied; e) Denial of professional development opportunities; and f) Exclusion from departmental activities and decisions." (Id. at

pp. 12–13.) Plaintiff claims she suffered "adverse health effects" and was forced to resign from her Faculty Senate position. (Id. at p. 13.)

To succeed on a hostile work environment claim, a plaintiff must prove that the harassment was, in relevant part, "sufficiently severe or pervasive to alter the terms of employment." Yelling v. St. Vincent's Health Sys., 82 F.4th 1329, 1334 (11th Cir. 2023). To that end, the Eleventh Circuit has "identified a nonexhaustive list of factors to delineate a minimum level of severity or pervasiveness necessary for harassing conduct." Id. at 1335 (quotations omitted). "Those factors are (1) the conduct's frequency, (2) its severity, (3) whether it was physically threatening or humiliating, rather than mere offensive utterances, and (4) whether it unreasonably interfered with the employee's job performance." Id. (alteration adopted) (quotations and citations omitted). No single factor is dispositive. The Eleventh Circuit has adopted a "totality of the circumstances approach," relying on each factor to guide the trial court's inquiry. Miller v. Kenworth of Dothan, Inc., 277 F.3d 1269, 1276 (11th Cir. 2002); see also Copeland v. Ga. Dep't of Corr., 97 F.4th 766, 775–76 (11th Cir. 2024). Hostile work environment claims are "different in kind" from tangible employment actions because they are "based on the cumulative effect of individual acts" of harassment which may not be independently actionable. Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 115 (2002). When the workplace is permeated with "discriminatory intimidation, ridicule, and insult," Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 65 (1986), that is "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment," id. at 67 (internal brackets and quotations omitted), Title VII is violated.

Here, Defendant argues that Plaintiff cannot succeed on her hostile work environment claim because the evidence does not support a finding that the conduct at issue was sufficiently

severe or pervasive to alter the terms and conditions of Plaintiff's employment. (Doc. 40-1, pp. 13–15.) Defendant argues that—as it has argued throughout its Brief—there is no evidence that any of the conduct was based on discrimination and there were sufficient legitimate, non-discriminatory reasons for the at-issue conduct. (Id. at p. 15.)

In her Response, Plaintiff focuses on arguing that Defendant has failed to "point to material in the record to demonstrate the absence of a genuine issue of material fact, which is a preliminary requirement a movant must meet to obtain summary judgment." (Doc. 55, p. 1; see also id. at p. 3 (citing Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991) and United States v. Four Parcels of Real Prop., 941 F.2d 1428, 1438 n.19 (11th Cir. 1991)).) This argument is not compelling, however. As stated by the Eleventh Circuit (in one of the cases relied upon by Plaintiff):

> When the *nonmoving* party has the burden of proof at trial, the moving party is not required to "support its motion with affidavits or other similar material negating the opponent's claim," Celotex, 477 U.S. at 323, in order to discharge this "initial responsibility." Instead, the moving party simply may "'show[ ]'—that is, point[ ] out to the district court—that there is an absence of evidence to support the nonmoving party's case." Id. at 324. Alternatively, the moving party may support its motion for summary judgment with affirmative evidence demonstrating that the nonmoving party will be unable to prove its case at trial. Id. at 331.

Four Parcels of Real Prop., 941 F.2d at 1437–38. Accordingly, in the context of a motion for summary judgment on a claim for hostile work environment, the defendant as the moving party can shoulder its burden by pointing out to the district court that there is an absence of evidence of a hostile work environment; that is, an absence of evidence to support a jury determination that the plaintiff suffered through conduct that was objectively "severe and pervasive," that physically threatened or humiliated the plaintiff, or that unreasonably interfered with her job performance. Defendant has done that here, through its briefing and its Statement of Material Facts and

supporting evidence, and Plaintiff's Response fails to show, in response, that a genuine issue regarding Defendant's conduct remains for trial. Id. ("If the moving party shows the absence of a triable issue of fact by either method, the burden on summary judgment shifts to the nonmoving party, who must show that a genuine issue remains for trial. If the nonmoving party fails to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof, the moving party is entitled to summary judgment.") (quotations and citations omitted).

Viewing the evidence in the light most favorable to Plaintiff, there is no basis for a jury to find that the issuance of the letter of concern, the emails from the Interim Dean, any (unspecified) change in "professional responsibilities," the failure to hire Plaintiff for a new position, and the denial of "professional development opportunities," and the "exclusion from departmental activities and decisions" constituted objectively severe and pervasive conduct that physically threatened or humiliated Plaintiff or unreasonably interfered with her job performance. To the contrary, the evidence provided by Plaintiff indicates that Plaintiff voluntarily withdrew from the faculty Senate after missing meetings and that she was sending emails to the Interim Dean and other faculty members and administrators, which prompted the Interim Dean to respond. (In fact, the evidence indicates that the Dean responded directly to Plaintiff instead of replying "all" so that Plaintiff could retain privacy in discussing the matter, if she wished.) There is no evidence that any of the alleged "conduct" involved racial or national-origin-related slurs or any other kinds of humiliation or that any of the conduct impacted Plaintiff's ability to perform her daily job duties.[6]

[6] While the Court has not been asked to consider the viability of Plaintiff's claim that the denial of her travel allowance was discriminatory and while the Court has found—with regard to other counts—that genuine issues of fact remain concerning the failure to hire Plaintiff for the new position, even viewing the evidence in the light most favorable to Plaintiff, these two acts do not support a *prima facie* showing—or even a "convincing mosaic"—of a hostile work environment claim (even with considered with the other conduct relied upon by Plaintiff). There is no evidence that the denial of the travel allowance had anything

Accordingly, the Court finds that Plaintiff cannot establish a *prima facie* case for a hostile work environment and the Court therefore **GRANTS** Defendant's Motion for Summary Judgment on Count V.

**CONCLUSION**

For the foregoing reasons, the Court **GRANTS in part** and **DENIES in part** Defendant's Motion for Summary Judgment. (Doc. 40.) The Court **GRANTS** the Motion as to Counts II and IV, as Plaintiff has stated that she does not wish to proceed with those claims. The Court additionally **GRANTS** the Motion as to Count III (Retaliation) and Count V (Hostile Work Environment), and also as to Count I (Discrimination), but only to the extent that Plaintiff bases her claim on the issuance of the letter of concern or the temporary denial of tuition assistance. The Court **DENIES** the Motion as to Plaintiff's claims, in Count I, that Defendant committed race and national origin discrimination through the non-renewal of Plaintiff's contract and through the failure to hire Plaintiff for the new professor position.

**SO ORDERED**, this 30th day of September, 2026.

R. STAN BAKER, CHIEF JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA

to do with Plaintiff's race or national origin, or that it impacted Plaintiff's work environment, or caused her to suffer insults, threats, or humiliation in front of others. As to the failure to hire, there is no evidence indicating that it impacted Plaintiff's work environment or the conditions of her then-current employment, and there is no evidence that any kind of discriminatory statement or other hostile action was made in connection with Plaintiff's application process or how she was informed that she was not selected.